UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | EDCV 13-2203-JGB (SPx) | Date | September 1, 2015 |
|---|---|---|---|
| Title | *Mayra Rodas v. Standard Insurance Company, et al.* | | |

Present: The Honorable  JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s): Attorney(s) Present for Defendant(s):

None Present  None Present

**Proceedings:** FINDINGS OF FACT AND CONCLUSIONS OF LAW (IN CHAMBERS)

In this Employment Retirement Income Security Act ("ERISA") action, Plaintiff Mayra Rodas ("Plaintiff") alleges she was wrongfully denied disability benefits. Plaintiff seeks recovery of disability benefits under an ERISA-governed benefit plan ("Plan") established and maintained by her employer, Defendant UnitedHealth Group ("UHG"). (Compl., Doc. No. 1.) Defendant Standard Insurance Company ("Standard") is the payor of the benefits Plaintiff seeks.[1]

On July 20, 2015, Plaintiff, Standard, and UHG each filed trial briefs. ("Pl. Br.," Doc. No. 63, "St. Br.," Doc. No. 64, and "UHG Br.," Doc. No. 65.) On July 27, 2015, the Parties each filed responsive trial briefs. ("Pl. Opp'n," Doc. No. 67, "St. Opp'n," Doc. No. 68, and "UHG Opp'n," Doc. No. 69.) Upon reviewing the Parties' trial briefs and the Administrative Record ("AR"), the Court determined that argument was unnecessary for decision on this matter, and therefore took the matter under submission on August 27, 2015. See Local Rule 7-15; Fed. R. Civ. P. 78.

---

[1] The Court will refer to Defendants UHG, UnitedHealth Group Long-Term Disability Plan, and Standard Insurance Company as "Defendants."

## I. FINDINGS OF FACT[2]

"In bench trials, Fed. R. Civ. P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 792 (9th Cir. 1986) (quoting Fed. R. Civ. P. 52(a)). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." Id. (citations omitted). The following constitutes the findings of fact based on the Administrative Record.

Plaintiff worked for UHG as a "Broker Agent Service Specialist" for almost ten years, from 2001 until March 29, 2011. (AR 795-96.) Plaintiff's job was a largely sedentary one—her duties included "processing and maintaining commission payment records" as well as "researching, analyzing and resolving commission payment and broker service issues." (AR 791.)

As a child, Plaintiff suffered from polio. In May 2006, Plaintiff's physician, Dr. Yolanda Grady, diagnosed her with "post-polio syndrome." (AR 499.) Post-polio syndrome is a condition that typically develops decades after recovery from the initial polio infection. (AR 698.) According the Mayo Clinic, studies have shown that up to half the people who had polio at a young age may experience post-polio syndrome. (AR 698) Symptoms of the disease include progressive muscle and joint weakness; pain in the muscles and joints; and general fatigue and exhaustion with minimal activity. (AR 698.) Although the cause is unknown, the most accepted theory is that degenerating nerve cells are the culprits—polio infections often leave many motor neurons damaged or destroyed, and the remaining neurons undergo additional stress, which may lead to gradual deterioration over time. (AR 699.)

In most people, post-polio syndrome "tends to progress slowly, with new signs and symptoms followed by periods of stability." (AR 699.) From 2006 to 2011, Plaintiff's post-polio syndrome followed that pattern, and she began experiencing swelling and pain in her right foot. (AR 471, 473, 488, 492, 494, 495.) A note from Dr. Grady in August 2010 stated that Plaintiff had begun using a walker. (AR 180.)

On March 18, 2011, Plaintiff visited Dr. Grady due to worsening pain in her right leg. (AR 179.) Plaintiff requested a referral to an orthopedist. (AR 179.) A week later, Plaintiff underwent a radiologic consultation; the report noted several deformities in Plaintiff's right leg and noted Plaintiff's clinical history as "post polio syndrome." (AR 190.) On March 29, 2011, Plaintiff stopped working at UHG. That same day, she was referred to Dr. Mazin Sabri, an orthopedic surgeon. (AR 227.) Dr. Sabri noted that Plaintiff had severe pain and that the

---

[2] The Court has elected to issue its decision in narrative form because a narrative format more fully explains the reasons behind the Court's conclusions, which aids appellate review and provides the parties with more satisfying explanations. Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

severity was increasing. (AR 227.) He also noted that Plaintiff could only walk with a walker and that her symptoms were affecting her work. (AR 227.) A day later, in a letter to Dr. Grady, Dr. Sabri stated that his examination of Plaintiff's right leg revealed "shortening and atrophy" and that the right ankle and midtarsal joint of the foot were both fused. (AR 225.) Dr. Sabri recommended that Plaintiff use elastic stockings and elevate her leg to address swelling. (AR 225.)

Soon thereafter, Plaintiff submitted a claim for short-term disability benefits.[3] Sedgwick CMS ("Sedgwick"), a non-party to this suit, administered Plaintiff's benefits claim. On April 11, 2011, Dr. Sabri submitted an "attending physician's statement" to Sedgwick. (AR 217-20.) It noted that Plaintiff was unable to walk well, and had pain and tiredness. (AR 218.) Dr. Sabri also stated that Plaintiff was "totally disabled from work" with an estimated return-to-work date of July 1, 2011.[4] (AR 219.)

On the final page of the "attending physician's statement," Dr. Sabri checked a box indicating that Plaintiff could sit for five to eight hours a day. (AR 220.) Yet just two days later, on April 13, 2011, Dr. Sabri filled out a "functional capabilities statement" in which he stated that Plaintiff could only sit for up to 2.5 hours a day. (AR 213.) These two forms directly conflict. (See AR 220, 213.) However, the "functional capabilities statement" is clearly the more considered and deliberate of the two: in that statement, Dr. Sabri handwrote that "after about 2 [hours] of sitting [Plaintiff's] foot swells causing patient pain and discomfort therefore any standing or walking only makes condition worse." (AR 213.)

---

[3] The Plan was established by UHG to provide for payment of disability benefits when a claims administrator determines that an employee cannot work because of a disability. (Doc. No. 60 at 2.) The Plan has both a short-term and a long-term component. This lawsuit only concerns the long-term component, but the factual history requires an understanding of both.

The long-term disability plan divides benefits into three different time periods. The first is a 180-day "Waiting Period". (Id.) The Waiting Period is co-extensive with the short-term disability plan—however, an injured employee would receive benefits from the short-term disability plan during this period. The second time period is a 24-month "Own Occupation" period, during which the employee begins to receive benefit payments under the long-term disability plan. (AR 816.) The third is a potentially indefinite "Any Occupation" period, when the employee would continue to receive benefit payments under the long-term disability plan, provided they met the stricter standard for "Any Occupation" disability. (AR 816.)

In addition to three time periods, there are three parties involved in the administration of the disability-benefits plan. First is Plaintiff's employer, UHG. UHG pays out employee benefits (funds the plan) during the Waiting Period and the Own Occupation period. (Doc. No. 60 at 2.) Second is Sedgwick CMS, who is not a party to this suit. Sedgwick administers the plan during the Own Occupation period. (AR 816.) Third is Standard, who administers and funds the LTD Plan during the Any Occupation Period. (AR 816.)

[4] Dr. Sabri extended this estimated return-to-work date several times. (AR 207, 544.)

On April 14, 2011, one day after Dr. Sabri's "functional capabilities statement," Sedgwick denied Plaintiff's short-term disability benefits claim. (Doc. No. 37-4 at 2.) Sedgwick based its denial on the opinion of one of Sedgwick's registered nurses, who reportedly reviewed Dr. Sabri's March 30, 2011 letter; his April 11, 2011 "attending physician's statement"; and his April 13, 2011 "functional capabilities statement." (Id.)

After Plaintiff appealed the denial of her short-term disability benefits, Sedgwick hired Dr. Martin Mendelssohn, an orthopedist, to conduct a review of Plaintiff's records, which he did on September 6, 2011. (AR 519.) Dr. Mendelssohn did not examine Plaintiff. He attempted to call Dr. Sabri several times, but was unsuccessful. (AR 519.) Based on reviewing the records, Dr. Mendelssohn concluded that Plaintiff's condition did not prevent her from doing her job. (AR 521.) He acknowledged that Plaintiff had "a history of polio from the age of six months, has had multiple surgical procedures, and has a residual fusion of her ankle and foot with a shortening of her extremity," but stated that this was "not recent." (AR 520.) He then stated that the medical documentation does "not reveal any functional [] or neurological deficits that would functionally limit [Plaintiff] from performing her [job] as a broker agent, which is a sedentary occupation." (AR 520.) Dr. Mendelssohn did not attempt to square this conclusion with Dr. Sabri's April 13 "functional capabilities statement," which determined that Plaintiff could not sit for longer than 2.5 hours. (See AR 519-521.) Based on Dr. Mendelssohn's review, Sedgwick upheld the denial of Plaintiff's short-term disability benefits.

On January 5, 2012, Dr. Sabri noted that Plaintiff had begun using a wheelchair. (AR 208.) On January 11, 2012, Dr. Sabri filled out a form in which he estimated that Plaintiff's disability would last until April 1, 2012. (AR 207.)

On January 26, 2012, Plaintiff again appealed the denial of her short-term disability benefits. (Doc. No. 37-3.) In her second appeal, she explained that she was not currently suffering from polio—an assumption upon which Dr. Mendelssohn seemed to base his review—but rather that she was struggling with post-polio syndrome. (Id. at 1-2.) Plaintiff explained that she was disabled because she could not sit in an upright position for more than 2.5 hours a day, and that her foot became painfully swollen when she sat upright. (Id.) On February 3, 2012, UHG's Appeals Committee denied Plaintiff's second appeal, basing their decision on Dr. Mendelssohn's record review. (Doc. No. 37-4 at 9.) The Committee did not seek a second opinion from another doctor. (Id.)

On March 4, 2012, Plaintiff saw Dr. Javier Descalzi. (AR 307.) Dr. Descalzi wrote that Plaintiff "worked an office job until a year ago when began having increasing pain and swelling of right foot when sitting for prolonged period. Foot painful and swollen when at work. Better when elevated but unable to do so at work." (AR 307.)

On April 21, 2012, the Social Security Administration ("SSA") found that Plaintiff was disabled as of March 29, 2011. (AR 737.) The SSA held that Plaintiff was entitled to Social Security disability benefits dating back to September 2011. (AR 737.)

On May 5, 2012, Plaintiff underwent a needle electromyography and nerve conduction examination (EMG/NCS) on her right leg. (AR 242, 379.) Dr. Peyman Andalib interpreted the results, and determined that they were "compatible with severe neurogenic finding" and that given her clinical history of polio, it was "possibly postpolio syndrome." (AR 379.)

After Plaintiff's short-term disability benefits were denied, Sedgwick referred her claim for long-term disability benefits to Standard.[5] (AR 135.) On November 11, 2012, Standard hired Dr. Arnold Kaminer, a specialist in occupational medicine, to perform a record review of Plaintiff's claim. (AR 228.) Dr. Kaminer opined that Plaintiff would be able to engage in full-time sedentary work, but that she "would be able to engage in only very limited standing and walking activities." (AR 229.) He also stated that Plaintiff would have to "change position with movement of the right lower extremity on a periodic basis to limit swelling of the right lower extremity that occurs when it is dependent [not elevated] for prolonged periods of time." (AR 230.)

On March 18, 2013, Standard denied Plaintiff's claim for long-term disability benefits, based in part on Dr. Kaminer's record review. (AR 124.) This denial references Dr. Sabri's April 11, 2011 "attending physician's statement" in which he stated that Plaintiff could sit continuously. (AR 125.) It does not mention Dr. Sabri's April 13, 2011 "functional capabilities statement" that contradicted his previous statement and explained that Plaintiff could only sit for 2.5 hours a day. (See AR 125.)

On August 26, 2013, Plaintiff appealed the denial of her long-term disability benefits. (AR 193.) Plaintiff included the entire file provided to her by the SSA and several letters from people who had witnessed Plaintiff's medical condition firsthand. (AR 193.) Two of these letters came from James Luna, Plaintiff's son, and Adrian Robles, an ex-marine who rented a room from Plaintiff. (AR 196, 198.) Both attested that Plaintiff needed frequent help and supervision, as her physical condition made travel and daily living difficult. (AR 196, 198.) Another letter came from Amber Cruz, who was a former co-worker of Plaintiff's when she worked at UHG. (AR 195.) Cruz stated the following:

> I first met [Plaintiff] working at United Health Care in 2006; she appeared healthy with not physical disabilities, only a slight limp. Through the next couple of years her health began to decline in which she had to require a walker. [Plaintiff] began to arrive very early to work because she would need assistance getting herself and her walker out of the car and getting into the building . . . As the years went on the help she required increased in frequency. If she would have to do too much walking by herself her foot would become extremely swollen and would need to be elevated, which was something that could not be done easily while at a desk

---

[5] It is unclear why Sedgwick referred the claim to Standard, as Sedgwick was the claims administrator during the "Own Occupation" period of the long-term disability plan. (AR 816.) The referral states that Sedgwick felt "it was best for Standard to review [Plaintiff's] claim from a [long-term disability] perspective to determine if you would do anything differently." (AR 135.)

working.  Sitting [in] the same position for too long would also have the same effect on her foot and leg, and would need to be elevated to alleviate pain.

(AR 195.)

On September 9, 2013, Standard hired Dr. Joshua Alpers to do another record review.  (AR 160.)  Dr. Alpers wrote that " '[p]ost-polio syndrome' is a debateable entity; though progressive weakness is well described as occurring decades after [polio], this is not clearly attributable to a distinct pathological process and may owe to loss of very large motor units that develop following [polio] in the context of the natural history of the disease."  (AR 160.)  After reviewing the record, Dr. Alpers concluded that "from a neurological standpoint [Plaintiff] was reasonably capable of working on a full-time basis from March 2011 to the present; comment is deferred regarding the impact of her non-neurological conditions to include right lower extremity orthopedic issues."  (AR 161.)

On November 27, 2013, Standard denied Plantiff's appeal.  (AR 582.)  Standard based its denial on the opinions of Dr. Mendelssohn, Dr. Kaminer, and Dr. Alpers.  (AR 583-85.)

## II.  CONCLUSIONS OF LAW

### A.  Standard of Review

Under ERISA, a beneficiary or plan participant may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006).  The Court has determined that a de novo standard of review should be applied to the denial of Plaintiff's benefits.  (See Doc. No. 60.)  A court employing de novo review in an ERISA case "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).  "[T]he court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." Muniz v. Amec Const. Mgmt. Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010).  In reviewing the Administrative Record, "the Court evaluates the persuasiveness of each party's case, which necessarily entails making reasonable inferences where appropriate." Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program, 718 F. Supp. 2d 1151, 1162 (N.D. Cal. 2010)

### B.  Discussion

As the Court is applying de novo review, no deference is given to the claim administrator's decision, and the Court merely evaluates the persuasiveness of each side's case and determines if Plaintiff has adequately established the she is disabled under the Plan.

#### 1. The Plan's Definition of Disabled and Plaintiff's Job Duties

Plaintiff has stated that the issue in this case is whether she was disabled during the Own Occupation period.  (Doc. No. 53 at 1.)  The disability benefits plan defines disabled as follows:

> During the [Waiting Period] and during the [Own Occupation period] You are Disabled if, as a result of a Medical Condition, you are unable to perform with reasonable continuity the Material Duties of you Own Occupation, and as a result you are unable to earn at least 80% of your Predisability Earnings . . .

(AR 816.)

Plaintiff's job was largely sedentary and required her to work sitting down at a desk. (See AR 791.)

### 2. Plaintiff's Case

Plaintiff has presented persuasive evidence that she suffered from post-polio syndrome, and that this affliction made it difficult for her to move around and caused her to become tired easily. Most importantly, Plaintiff has shown that she could not sit for longer than approximately 2 hours at a time—which would make performing her job duties exceedingly difficult, if not impossible. Plaintiff's evidence comes from three sources: (1) her treating physicians; (2) close acquaintances; and (3) the SSA's finding that she was disabled.

#### a. The Opinions of Plaintiff's Treating Physicians

Plaintiff had the most contact with her two treating physicians, Dr. Grady and Dr. Sabri. Dr. Grady first listed "post-polio syndrome" as a diagnosis for Plaintiff in May 2006. (AR 499.) As is apparently typical of the disease, (see AR 699), Plaintiff's post-polio syndrome began to cause her progressively more pain and swelling in her right foot from 2006 to 2011, as documented by Dr. Grady. (AR 471, 473, 488, 492, 494, 495.) Plaintiff began using a walker sometime around 2010, (see AR 180), and by January 2012 she was using a wheelchair. (AR 208.)

Dr. Sabri, an orthopedic specialist who appears to have had the most contact with Plaintiff (regarding her post-polio syndrome), has consistently opined that Plaintiff was disabled. (AR 207, 219, 532, 538, 541, 544.) In his notes from Plaintiff's first visit, Dr. Sabri noted that Plaintiff had severe pain in her leg, which was becoming worse, and that this pain was affecting her work. (AR 227.) Dr. Grady noted, as did several other diagnosticians, that Plaintiff's right leg was shortened, atrophied, and had various structural problems. (AR 225.)

After that first visit, Dr. Sabri filled out a "functional capabilities statement" in which he noted that "after about 2 [hours] of sitting [Plaintiff's] foot swells causing patient pain and discomfort therefore any standing or walking only makes condition worse." (AR 213.) Dr. Sabri wrote that Plaintiff could only sit for up to 2.5 hours a day. (AR 213.) This "functional capabilities statement," which Defendants' record reviews never adequately addressed, is strong evidence that Plaintiff was disabled. A sedentary job requires the ability to sit for most of the day. See Carter v. Barnhart, 58 Fed. Appx. 304, 306 (9th Cir. 2003.) Since Plaintiff could only sit for around 2 hours before she began suffering acute pain, it is unclear how she could carry out her job duties. And it seems unlikely that she could do her job in a reclining position; in fact, several sources in the record suggest that Plaintiff could not elevate her foot while at work. (AR 195, 307.)

While Defendants make much of Dr. Sabri's April 11, 2011 "attending physician's statement," in which Dr. Sabri checked a box indicating that Plaintiff could sit for five to eight hours a day, that one check mark was clearly superseded by the "functional capabilities statement" which came two days later. (AR 213.) The "functional capabilities statement" is obviously the product of more consideration and thought by Dr. Sabri—it contains handwritten notes that unequivocally place a 2.5-hour limit on Plaintiff's sitting during the day. (AR 213.)

The Court places significant weight on the opinions from Dr. Sabri and Dr. Grady. These physicians directly examined Plaintiff over extended periods of time and during multiple visits. They provided significant documentation concerning Plaintiff's post-polio syndrome and how it affected her ability to do her job. And Dr. Grady has consistently maintained her diagnosis of post-polio syndrome, (AR 471, 473, 488, 492, 494, 495, 499.) while Dr. Sabri has consistently opined that Plaintiff was disabled from performing her job. (AR 207, 219, 532, 538, 541, 544.)

These conclusions are supported by several other medical sources. On March 4, 2012, Dr. Descalzi wrote that Plaintiff "worked an office job until a year ago when began having increasing pain and swelling of right foot when sitting for prolonged period. Foot painful and swollen when at work. Better when elevated but unable to do so at work." (AR 307.) Additionally, after Plaintiff underwent an EMG/NCS examination, Dr. Andalib interpreted the results, and stated that they were "compatible with severe neurogenic finding" and that given her clinical history of polio, it was "possibly postpolio syndrome." (AR 379.)

### b. The Opinions of Plaintiff's Son, Tenant, and Co-worker

Plaintiff has also submitted evidence of her disability from accounts of her son, tenant, and a co-worker. These accounts are particularly useful because these people were able to directly observe Plaintiff's struggles with post-polio syndrome. See Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) ("Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence."); Smith v. Bowen, 849 F.2d 1222, 1226 (9th Cir. 1988) (in overturning a denial of benefits, explaining that "the testimony of those who lived with or saw Smith on a daily basis should have been weighed in the assessment of the frequency and disabling effects of his seizure episodes.")

Plaintiff's son explained that his mother needed his help accomplishing daily chores, as it was "extremely difficult for [Plaintiff] to do [them] on her own." (AR 196.) He also stated that "she constantly needs someone around to help her" and that "simple tasks are made difficult due to her disability." (AR 196.) Plaintiff's tenant, a former Marine, explained that he routinely had to help Plaintiff with activities around the house, and that "she needs someone around at all times throughout the day because she would not be able to do things on her own." (AR 198.) The Court places particular weight on the observations of Amber Cruz, Plaintiff's co-worker, as Cruz was able to observe Plaintiff in the work environment. Cruz provided a detailed firsthand account of how Plaintiff's health worsened since 2006, and how she began to require more and more assistance. (AR 195.) Cruz explained that "if [Plaintiff] would too much walking by herself her foot would become extremely swollen and would need to be elevated, which was something that could not be done easily while at a desk working." (AR 195.) Cruz also

explained that "sitting in the same position for too long would also have the same effect on her foot and leg, and [her foot] would need to be elevated to alleviate pain." (AR 195.)

### c. The SSA's Determination that Plaintiff Was Disabled.

Finally, the Court finds persuasive the SSA's finding that Plaintiff was disabled, as a result of her post-polio syndrome, as of March 29, 2011. (AR 199, 737.) According to the SSA's records, the only medical records that the SSA received were those provided by Dr. Grady and Dr. Sabri. (AR 192.) These records were apparently sufficient to convince the SSA that Plaintiff qualified as disabled under the SSA's definition.

Notably, the SSA's definition of disability is stricter than that under the Plan. To receive Social Security disability benefits, Plaintiff had to prove that she had an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for [at least] 12 months." 42 U.S.C. § 423(d)(1)(A), § 423(d)(5)(A).

The Ninth Circuit has explained that evidence of a Social Security disability award is "of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary." Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 679 (9th Cir. 2011). While the de novo standard of review applies in this case, the Court must take into account the "weighty evidence" that the SSA found that Plaintiff was disabled. See id.

### 3. Defendants' Case

The Court finds that Defendants' assertion that Plaintiff is not disabled has two significant flaws. First, none of Defendants' reviewing doctors conducted a physical examination. Second, none of the reviewing doctors adequately addressed Plaintiff's inability to sit for longer than 2.5 hours a day.

First, Standard denied Plaintiff's benefits claim based on the opinions of three doctors, none of whom ever examined or spoke with Plaintiff. Under the Plan, the claims administrator had the right to require Plaintiff to undergo an in-person examination by a physician. AR 825-26. However, Standard discounted Plaintiff's medical concerns (as well as the opinions of her treating physicians) without ever asking her to undergo an examination of any kind. While record reviews are certainly allowed, Defendants' reliance on only paper reviews in this case is questionable, given the evidence Plaintiff provided concerning her alleged disability. See Montour v. Hartford, 588 F.3d 623, 634 (9th Cir. 2009) (Insurer's decision to conduct a "pure paper review" can raise "questions about the thoroughness and accuracy of the benefits determination."); Calvert v. Firstar, 409 F.3d 286-296-97 (6th Cir. 2005) ("[T]he failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.")

Additionally, none of Standard's reviewing physicians adequately addressed Dr. Sabri's conclusion—which was supported by opinions from Dr. Grady and Dr. Descalzi, as well as the EMG/NCS examination—that Plaintiff could not sit for longer than approximately two hours a day. Instead, as previously discussed, Standard and its reviewing physicians relied heavily on

Dr. Sabri's April 11, 2011 "attending physician's statement." (AR 159, 229, 520.) None of the reviewing physicians actually spoke with Dr. Sabri—although Dr. Mendelssohn apparently tried to call him— to discuss his later, more explicit statements in the "functional capabilities statement" about Plaintiff's inability to sit for long periods of time.

Dr. Mendelssohn, in his report, states that Plaintiff's "history of polio" is "not recent." (AR 520.) However, Dr. Mendelssohn apparently did not understand that Plaintiff was not seeking benefits based on her "history of polio," but rather the worsening symptoms caused by her post-polio syndrome. He did not directly address these symptoms in his report. Instead, he made the conclusory statement that "the provided medical documentation does not reveal any deficits or neurological deficits that would functionally limit [Plaintiff] from performing her [job] as a broker agent." (AR 520.) Dr. Mendelssohn also stated that Plaintiff "is noted to have some swelling in her foot" but then concluded that this "would not impact her ability to function" in her job. (AR 521.) Dr. Mendelsson provided no explanation for how he arrived at that conclusion.

Dr. Kaminer, in his report, concluded that Plaintiff "would be able to engage in full-time sedentary activities" although she "would be able to engage in only very limited standing and walking activities." (AR 229.) Dr. Kaminer did not address how Plaintiff would be able to perform a full-time sedentary job if she could not sit for longer than 2.5 hours without experiencing painful swelling in her leg. As to that issue, he merely stated that Plaintiff would "have to change position of the right lower extremity on a periodic basis to limit swelling." (AR 229-230.) He did not explain how Plaintiff could accomplish this "change of position" (presumably elevating her foot while laying down) at a sedentary job that requires prolonged periods of sitting.

Finally, Dr. Alpers, the third doctor to review Plaintiff's file for Standard, apparently did not even come to a conclusion regarding Plaintiff's complaints of painful swelling in her leg. In his summary, Dr. Alpers, noted that "the diagnosis of remote poliomyelitis appears to be supported" and that "functional impairment is supported from a neurological standpoint." (AR 160-61.) He then concluded that "from a neurological standpoint, [Plaintiff] was reasonably capable of working on a full-time basis." (AR 161.) However, he explicitly "deferred" comment "regarding the impact of her non-neurological conditions to include right lower extremity orthopedic issues." (AR 161.) In other words, Dr. Alpers explicitly declined to address whether Plaintiff's swelling in her right leg would be considered disabling. As this was the primary reason for her disability claim, Dr. Alpers's record review is of limited use.

In light of the above, the Court finds that the evidence provided by Defendants supporting denial of Plaintiff's benefits is fairly weak, and is outweighed by the more detailed and thorough evidence submitted by Plaintiff. The Court concludes that Plaintiff has adequately established that she was disabled, under the terms of the Plan, during the Own Occupation period.

### III. CONCLUSION

        Based on its findings of fact and conclusions of law, the Court concludes that Plaintiff has adequately established that she was disabled, under the terms of the Plan, during the Own Occupation period.[6]  Accordingly, Plaintiff is entitled to have judgment entered in her favor. The Court ORDERS Plaintiff to submit a proposed judgment consistent with this order by **September 8, 2015**.

        **IT IS SO ORDERED.**

---

[6] The Court makes no finding as to whether Plaintiff was disabled during the Any Occupation period of the Plan.